## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

GEORGEIA MORENO, GEORGEIA
MORENO, on behalf of her minor son, T.
MORENO, and her minor daughter, B.
MORENO, DARLENE STAYMATES, and
MARK STAYMATES,

        Plaintiffs,

        v.

CITY OF PITTSBURGH, CHIEF OF
POLICE NATHAN HARPER, OFFICER
MICHAEL REDDY, OFFICER BRIAN
NICHOLAS, OFFICER WILLIAM
FRIBURGER, OFFICER DOUGLAS EPLER,
OFFICER DONALD P. GORHAM,
OFFICER JOSEPH NOVAKOWSKI,
OFFICER LISA KOLARAC, OFFICER
NEAL MARABELLO, OFFICER GLENN
HAIRSTON, LIEUTENANT JOSEPH
TERSAK, OFFICER NATHANIEL BURTT,
OFFICER ERIK ENGELHARDT, OFFICER
WADE SARVER, and OFFICER CARL
MOROSETTI,

        Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

Civil Action No. 12-615
Judge Nora Barry Fischer

## MEMORANDUM OPINION AND ORDER

This is a civil rights action pursuant to 42 U.S.C. § 1983, alleging violations of Plaintiffs'

constitutional rights stemming from a SWAT raid that occurred on December 7, 2010. (Docket

No. 56). Presently pending before the Court are Defendants Reddy, Nicholas, Friburger, Epler,

Gorham, Novakowski, Kolarac, Hairston, Marabello, Tersak, Burtt, Engelhardt, Sarver, and

Morosetti's ("Defendants") Motion for Summary Judgment. (Docket Nos. 101). This Motion

has been fully briefed. (Docket Nos. 101, 102, 103, 111, 112, 113, 114, 117, 121, 123, 126, 127,

128, 129-2). Upon consideration of all the parties' filings before the Court, the parties'

arguments at a Motion Hearing held on March 21, 2014, (Docket No. 129), the Supplemental

Record Materials provided by the parties on March 24, 2014, and for the reasons more fully stated herein, Defendants' Motion, (Docket No. 101), is DENIED.

## I.  BACKGROUND

On December 6, 2010 at approximately 9:00 PM, Georgeia Moreno ("Ms. Moreno"), her husband William Moreno ("Moreno"), and her step-father Mark Staymates ("Mr. Staymates"), were at home watching television in their first floor living room.[1]  (Docket No. 114-2 at 5).  Her son Billy Moreno ("Billy") was in the kitchen.  *Id.* at 13.  Her other two young children, T.M. and B.M., and her mother, Darlene Staymates ("Ms. Staymates"), were upstairs.  *Id.* at 14. Suddenly, without warning, a 23-Officer SWAT team in full gear and masks breached the doors of their home using open-air NFDD deployments (i.e., "flash-bang" devices).  *Id.* at 5.  The SWAT team was executing an arrest and search warrant for Moreno related to a bar fight that had taken place the previous evening at the Polish Vets Bar.  (Docket No. 102-14).  Moreno was apparently charged with, and later convicted of, the aggravated assault of an off-duty Pittsburgh Police Officer, Michael Murray ("Murray"), during the bar fight.  (Docket No. 101 at 2).

Defendant Carl Morosetti ("Morosetti") investigated the bar fight and discovered that Murray had sustained a fractured lower leg and a skull fracture on his left side, with six staples. (Docket No. 102-3 at 2).  After speaking with the bartender who had been working during the fight, Morosetti obtained a copy of videotape surveillance of the fight, and identified Moreno, with the assistance of other officers.  *Id.*  Morosetti had not had any prior law enforcement contact with Moreno, but Morosetti apparently "knew" Moreno to be "violent" since Morosetti

---

[1]  The facts are viewed in the light most favorable to the Plaintiffs, as this case comes before the Court on Defendants' Motion for Summary Judgment.  *See, e.g.*, *Marino v. Indus. Crating Co.*, 358 F.3d 241, 247 (3d Cir. 2004) ("Under Federal Rule of Civil Procedure 56(c), summary judgment is proper where no genuine issue of material fact exists, and where, viewing the facts in the light most favorable to the party against whom summary judgment was entered, the moving party is entitled to judgment as a matter of law.").

had been in high school. (Docket No. 114-3 at 7). Morosetti also knew that Moreno was on federal supervised release, and had spoken with Moreno's U.S. Probation Officer, Rosa Doherty ("Doherty"). (Docket No. 114-3 at 12). At this point, the decision to use SWAT was apparently made during a conversation between Morosetti, Defendant Michael Reddy ("Reddy"), and Defendant Brian Nicholas ("Nicholas"). (Docket No. 114-5 at 3). Yet, none of these officers know who made the initial request for SWAT assistance. *Id.* Even Morosetti denies making any initial request for SWAT assistance. (Docket No. 114-3 at 5-6). Morosetti also did not mention the use of SWAT to Doherty, nor did he ask her whether Moreno or anyone else living within his home could be expected to be violent, armed, or dangerous. (Docket No. 114-4 at 9-12).

Using information provided by Morosetti, Defendant Erik Engelhardt ("Engelhardt") calculated an Arrest/Threat Warrant Section score of 29 based on a SWAT Decision Matrix. (Docket Nos. 102-6 at 3, 114-1). The score of 29 is a middle zone score, in which SWAT was not required, cautioning the zone or unit supervisor, i.e., Morosetti, to contact the SWAT supervisor, i.e., Defendant Joseph Tersak ("Tersak"), for further consultation. (Docket No. 114-1 at 4). Engelhardt calculated the optimal number of SWAT operators (officers) as 24, based on the SWAT team's "standard approach," (Docket No. 103 at 3), of using two SWAT operators for each problem; this case had seven rooms and five people, which corresponds to twelve problems. (Docket No. 102-6 at 6). Twenty-three SWAT operators were deployed. (Docket No. 114-1).

Subsequently, within less than 24 hours after the bar fight, the SWAT team was assembled and used to breach the front and back doors of the Moreno residence, as noted. (Docket No. 129-2 at 9-10). According to Officer Mescan, who is not a named defendant in this case, it was Officer Mercurio, along with Officer Honick,[2] who made the visual or auditory

---

[2] During the Motion Hearing held on March 21, 2014, counsel for Defendants informed the Court that Officer Mercurio was not deposed, but that Officer Honick was deposed, and Counsel for Plaintiffs offered to provide the

observation that occupants came to the door, assessed that police sought entry, and began to flee from the location of the door, which allegedly justified immediate breach and forced entry into the home. (Docket No. 102-20 at 3). However, according to Engelhardt, it was Officer Garris who observed a white male "running from the breach" and "called for [Officer] Turko to breach the sliding glass door." (Docket Nos. 121-5 at 18, 129-2 at 10).

Upon breaching the doors of the Moreno residence, the 23-member SWAT team entered and cleared the home. (Docket No. 129-2 at 10). Once the home was secure and Moreno was identified and restrained, nine detectives apparently entered the Moreno residence, confirmed the identification of Moreno, and began interrogating Plaintiffs. (Docket No. 114-9 at 4). Reddy, for instance, sought to identify the other suspects in the bar fight by questioning Ms. Moreno about who was involved in the fight and whether Moreno had mentioned the fight to her. (Docket No. 114-5 at 14). After the detectives determined that Plaintiffs did not have knowledge of the bar fight, they took custody of Moreno and left. The entire SWAT raid, arrest of Moreno, and questioning of Plaintiffs took place over approximately 1-2 hours. (Docket No. 114-6 at 4).

Following the SWAT raid, Plaintiffs discovered damage to their property; for example, Plaintiffs rely on deposition testimony and photographs concerning apparent damage to the front and back doors, the upstairs bedroom doors, the basement, the kitchen table and cupboard, two kitchen chairs, the drywall, a phone, several picture frames, and a laptop computer. (Docket No.

---

Court with the deposition of Officer Honick. However, upon further discussion, counsel for Defendants informed the Court that Officer Mercurio was relying on a second version of the SWAT Operations Deployment Report, (Docket No. 129-2 at 10), which was apparently produced months after the first version of the SWAT Operations Deployment Report, (Docket No. 114-1), had been produced and the City of Pittsburgh knew of the pending litigation, (Docket No. 129). The second version does not attribute the apparent visual or auditory observation of Moreno's attempt to escape or find a weapon to Officer Honick, but to Officer Garris, consistent with Engelhardt's deposition testimony. (Docket Nos. 121-5 at 18, 129-2 at 10). In any event, no deposition testimony (if it exists) for either Officer Honick or Garris was provided to the Court, and the facts are sufficiently disputed to warrant denial of summary judgment on this issue, as the Court discusses in § III.B, *infra*. The Court proceeds with its ruling.

114-2 at 15-16). Plaintiffs also reported physical and emotional injuries, such that both Mr. Staymates and T.M. sought medical treatment.[3] (Docket Nos. 102-12, 102-13).

## II.    LEGAL STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). Under Rule 56, a district court must enter summary judgment against a party "who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Summary judgment may be granted when no "reasonable jury could return a verdict for the nonmoving party." *Id.* "[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp.*, 477 U.S. at 323.

When a non-moving party would have the burden of proof at trial, the moving party has no burden to negate the opponent's claim. *Id.* The moving party need not produce any evidence showing the absence of a genuine issue of material fact. *Id.* at 325. "Instead, ... the burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court— that there is an absence of evidence to support the nonmoving party's case." *Id.* After the moving party has satisfied this low burden, the nonmoving party must provide facts showing that

---

[3] In response, Defendants obtained an independent medical examination of T.M. that disputes whether T.M.'s injuries were related to the SWAT raid. (Docket No. 102-21 at 1-3).

there is a genuine issue for trial to avoid summary judgment. *Id.* at 324. "Rule 56(e) permits a proper summary judgment motion to be opposed by any of the kinds of evidentiary materials listed in Rule 56(c), except the mere pleadings themselves." *Id.* In considering these evidentiary materials, "courts are required to view the facts and draw reasonable inferences in the light most favorable to the party opposing the summary judgment motion." *Scott v. Harris*, 550 U.S. 372, 378 (2007) (internal quotation marks and alterations omitted). "In qualified immunity cases, this usually means adopting … the plaintiff's version of the facts." *Id.*

## III.    DISCUSSION

At the outset, Plaintiffs admit that "defendants obtained an arrest warrant for William Moreno and a search warrant for the Celtic street home." (Docket No. 111 at 2). "Together, these warrants gave the defendants the authority to enter the plaintiffs' home and identify and arrest William Moreno." *Id.* They also "gave them permission to conduct a 'protective' sweep of the area in which Moreno was found." *Id.* However, Plaintiffs argue that Defendants used excessive force in their decision to use SWAT and during their entry to and search of the Moreno residence. *Id.* at 21-22. They also contend that "[c]ollecting personally identifying information on every person in the home after an arrest warrant has been served is standard procedure with the City of Pittsburgh Bureau of Police," which they maintain is unconstitutional. *Id.* at 3.

### A.    Decision to Use SWAT

When an "excessive force claim arises in the context of an arrest or investigatory stop of a free citizen, it is most properly characterized as one invoking the protections of the Fourth Amendment, which guarantees citizens the right 'to be secure in their persons ... against unreasonable ... seizures' of the person." *Graham v. Connor*, 490 U.S. 386, 394 (1989). "The proper test for evaluating an excessive force claim is therefore one of objective reasonableness."

*Sharrar v. Felsing*, 128 F.3d 810, 820 (3d Cir. 1997), *abrogated on other grounds by Curley v. Klem*, 499 F.3d 199, 211 (3d Cir. 2007). "Because the test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application, however, its proper application requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396 (internal quotation marks and citations omitted).

"Of course, the fact that the defendants had probable cause to arrest [plaintiff] does not mean that they could use any amount of force in that process." *Estate of Smith v. Marasco* *("Marasco I")*, 318 F.3d 497, 515 (3d Cir. 2003). "To state a claim for excessive force as an unreasonable seizure under the Fourth Amendment, a plaintiff must show that a 'seizure' occurred and that it was unreasonable." *Id.* "There is no per se rule that pointing guns at people, or handcuffing them, constitutes an arrest." *Baker v. Monroe Twp.*, 50 F.3d 1186, 1193 (3d Cir. 1995). "Under *Michigan v. Summers*, during execution of a search warrant, police can detain the occupant of the house they have a warrant to search." *Id.* at 1191 (citing *Michigan v. Summers*, 452 U.S. 692 (1981)) ("Under these circumstances, it was entirely reasonable to order the Bakers to 'get down,' until the situation was under control."). "This is reasonable to protect the police, to prevent flight, and generally to avoid dangerous confusion: 'The risk of harm to both the police and the occupants is minimized if the officers routinely exercise unquestioned command of the situation.'" *Id.* (quoting *Michigan v. Summers*, 452 U.S. 692, 702-03 (1981)).

Under the standard of objective reasonableness, "if a use of force is objectively unreasonable, an officer's good faith is irrelevant; likewise, if a use of force is objectively reasonable, any bad faith motivation on the officer's part is immaterial." *Marasco I*, 318 F.3d at

515.  To that end, even extreme "Rambo-type" behavior or methods may not constitute excessive

force under the Fourth Amendment, despite causing "plaintiffs' discomfort and humiliation."

*Sharrar*, 128 F.3d at 821-22.   Nevertheless, the Third Circuit has made clear that:

> The decision to deploy a SWAT team to execute a warrant
> necessarily involves the decision to make an overwhelming show
> of force—force far greater than that normally applied in police
> encounters with citizens. Indeed, it is the SWAT team's
> extraordinary and overwhelming show of force that makes
> 'dynamic entry' a viable law enforcement tactic in dealing with
> difficult and dangerous situations....
> ....
> The 'SWAT' designation does not grant license to law
> enforcement officers to abuse suspects or bystanders, or to vent in
> an unprofessional manner their own pent-up aggression, personal
> frustration or animosity toward others. If anything, the special
> circumstances and greater risks that warrant 'dynamic entry' by a
> SWAT team call for more discipline, control, mindfulness, and
> restraint on the part of law enforcement, not less. SWAT officers
> are specially trained and equipped to deal with a variety of difficult
> situations, including those requiring a swift and overwhelming
> show of force. At all times, SWAT officers no less than others—
> dressed in camouflage or not—must keep it clearly in mind that we
> are not at war with our own people.

*Marasco I*, 318 F.3d at 517-18 (quoting *Holland v. Harrington*, 268 F.3d 1179, 1190-95 (10th

Cir. 2001)).

Here, Plaintiffs have adduced sufficient evidence to demonstrate a genuine issue of

material fact as to whether the decision to use SWAT was reasonable.  To this end, a reasonable

jury could conclude that at the time the decision was made to use SWAT to secure his arrest,

Moreno was already on federal supervised release with a U.S. Probation Officer who had reliable

information and known intelligence, yet neither Morosetti nor the SWAT team asked for any of

this information prior to executing the SWAT raid.  (Docket No. 114-4 at 6-9).  The Probation

Officer testified that she could have provided Defendants with information concerning whether

Moreno was likely to be armed, violent or stable, a threat to the community, or a flight risk, as well as whether he would be likely to obey police orders or turn himself in. *Id.*

A reasonable jury could also credit the Probation Officer's testimony that had she known that Morosetti intended to use a SWAT team, she would have expressed concern over the safety of the small children and elderly people who lived in the house with Moreno, as they appeared to be a decent family. *Id.* The jury could weigh whether Morosetti made any inquiries with the Probation Officer about the nature of the individuals living with Moreno or whether they were likely to be involved in any criminal activity or to comply with police orders. *Id.* The fact that a U.S. Probation Officer with knowledge of the facts, and with responsibility for his supervision, may not have believed that SWAT was necessary to execute his arrest, or at minimum would have reconsidered the use of SWAT, given the other residents within the Moreno home, undermines Defendants' Motion for Summary Judgment on the decision to use SWAT. *Id.*

A jury could further find that the score of 29 for the SWAT Decision Matrix was not reasonable because two of the 29 points were assessed due to Defendants' assumption that "[s]ervice of warrant requires forced entry (use of a ram or pry tool)," (Docket No. 114-1 at 3), particularly when Defendants had not yet arrived at the Moreno residence, or provided Moreno with an opportunity to surrender without requiring forced entry or immediate breach. To that end, the Court is mindful that "regardless of whether objective reasonableness invokes a different and heightened standard from negligence, reasonableness under the Fourth Amendment should frequently remain a question for the jury." *Abraham v. Raso*, 183 F.3d 279, 290 (3d Cir. 1999).

After viewing the facts in the light most favorable to Plaintiffs, the Court finds that summary judgment is not warranted as to the initial decision to use SWAT to execute the arrest of Moreno.

**B.     Entry into the Moreno Home and Subsequent Investigation.**

Even putting aside the objective reasonableness of the decision to use SWAT, Plaintiffs have also presented sufficient facts to withstand summary judgment on the claim that Defendants used excessive force while entering and clearing the Moreno residence.  Of course, "[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 396-397.  "Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment." *Id.* (internal quotation marks omitted).

"In determining the reasonableness of all degrees of force, the Supreme Court has said that the factors to consider include the 'severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officer or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.'" *Abraham*, 183 F.3d at 289 (quoting *Graham*, 490 U.S. at 396).  The "use of guns and handcuffs must be justified by the circumstances." *Baker*, 50 F.3d at 1193. "[W]e must look at the intrusiveness of all aspects of the incident in the aggregate." *Id.* ("Here, accepting the Bakers' testimony, the police used all of those intrusive methods without any reason to feel threatened by the Bakers, or to fear the Bakers would escape.").

Because "each case alleging excessive force must be evaluated under the totality of the circumstances … the absence of physical injury [does not] necessarily signif[y] that the force has not been excessive, although the fact that the physical force applied was of such an extent as to lead to injury is indeed a relevant factor." *Sharrar*, 128 F.3d at 822.  "Other relevant factors include the possibility that the persons subject to the police action are themselves violent or dangerous, the duration of the action, whether the action takes place in the context of effecting an

arrest, the possibility that the suspect may be armed, and the number of persons with whom the police officers must contend at one time." *Id.* Even if individuals are "ordered out of bed naked and held at gunpoint while the deputies searched their bedroom for the suspects and a gun," the Supreme Court has held, "[d]eputies were not required to turn their backs to allow [plaintiffs] to retrieve clothing or to cover themselves with the sheets." *Los Angeles Cnty., California v. Rettele*, 550 U.S. 609, 612, 615 (2007). However, the continued detention of individuals at gunpoint can become unreasonable if "there is simply no evidence of anything that should have caused the officers to use the kind of force they are alleged to have used." *Baker*, 50 F.3d at 1193; *see also Rettele*, 550 U.S. at 615 ("This is not to say, of course, that the deputies were free to force Rettele and Sadler to remain motionless and standing for any longer than necessary.").

Here, the Court notes first the complete absence of a hostage, barricaded gunman, sniper, or active shooter, in which time may have been of essence or innocent lives at risk, which could provide a reason to breach the Moreno residence immediately. Delaying a forced entry by a matter of minutes to accurately assess the actual threat would not have risked any lives or the escape of Moreno. *See Estate of Smith v. Marasco ("Marasco II")*, 430 F.3d 140, 152 (3d Cir. 2005) ("When viewing the facts in the light most favorable to the Smiths, we believe that a reasonable officer would have concluded that, at the time the decision was made, Smith did not pose a threat that was sufficiently serious and immediate as to require storming his house."). The SWAT team had already covered all exits and escape routes from the home with its 23 operators. No contraband or evidence was sought. The SWAT team could have allowed Moreno to surrender voluntarily rather than arresting him at gunpoint in front of his young children.

The only justification provided by SWAT for the immediate breach is the alleged observation that Moreno attempted to escape or find a weapon. (Docket No. 102-20 at 3). Yet,

there is no deposition testimony by any of the officers who apparently observed Moreno's attempt to escape. Officer Mescan, who is not a named Defendant, provided deposition testimony that it was Officer Mercurio, along with Officer Honick, who made the visual or auditory observation that the occupants came to the door, assessed that there were police seeking entry, and began to flee from the location of the door, which was the purported justification for immediate breach and forced entry. (Docket No. 102-20 at 3). Officer Mescan testified: "In this case I'm not going to speak for them, but they saw something that indicated that we were there. They knew it was the police and began to flee away from the location. At that point, they breached the door." (Docket No. 121-9 at 2-3). Officer Mescan thus affirmed that he himself did not observe Moreno's attempted escape. *Id.* However, according to Engelhardt, it was Officer Garris who observed a white male "running from the breach" and "called for [Officer] Turko to breach the sliding glass door." (Docket No. 121-5 at 18). Nevertheless, the Court has been provided with no deposition testimony or affidavits from Officers Mercurio, Honick, Garris, or Turko, none of whom are Defendants. Defendants also do not mention any of these Officers or their observations within their Statements of Facts. (Docket Nos. 103, 117). Given Defendants' failure to produce any deposition testimony from witnesses who apparently observed Moreno's alleged attempt to escape or find a weapon, the Court finds that Defendants have not established that summary judgment on Defendants' decision to breach the door is warranted.

Plaintiffs also rely on their deposition testimony that none of them had heard any announcements from the public address system prior to the breach of the front and back doors, despite Engelhardt's testimony to the contrary. After viewing the facts in the light most favorable to Plaintiffs, this factual issue should be reserved for the jury, as it is up to the jury to

determine the credibility of witnesses on such contested points. *See Marino v. Indus. Crating Co.*, 358 F.3d 241, 247 (3d Cir. 2004) (quoting *Anderson*, 477 U.S. at 255) ("In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence; instead, the non-moving party's evidence 'is to be believed and all justifiable inferences are to be drawn in his favor.'").

Second, Defendants have failed to justify their continued search of the Moreno residence and seizure of its occupants after Moreno had already been identified and handcuffed by SWAT officers. Tersak himself admitted that the objective of the arrest and search warrant was complete when the SWAT team had cleared the home for the detectives to enter. (Docket No. 114-9 at 6). He also admitted that the only permissible scope of search authorized by the search warrant was to locate Moreno, and that this scope had been achieved by the SWAT team before the detectives entered the Moreno residence. *Id.* at 5-6. Both the Warrant of Arrest and Application for Search Warrant and Authorization list Moreno himself as the only subject to be seized. (Docket No. 102-14 at 3). Nevertheless, despite Ms. Moreno's testimony that Moreno was the first person to be identified and handcuffed within the living room on the first floor of the residence, (Docket No. 114-2 at 9), the SWAT team continued to search the remainder of the residence, including the second floor and the basement, and "cuff" several additional unarmed individuals, including a "younger 20's male," a "female," and an "older male," according to the first version of the SWAT Operations Deployment Report, (Docket No. 114-1 at 10).

To be sure, officers who possess an arrest and search warrant for a suspect are entitled to enter and search "anywhere in the house in which [the suspect] might be found." *Maryland v. Buie*, 494 U.S. 325, 333 (1990). "Once he [i]s found, however, the search for him [i]s over, and there [i]s no longer that particular justification for entering any rooms that had not yet been

searched." *Id.* "[A]s an incident to the arrest the officers could, as a precautionary matter and without probable cause or reasonable suspicion, look in closets and other spaces immediately adjoining the place of arrest from which an attack could be immediately launched." *Id.* at 334 ("We should emphasize that such a protective sweep, aimed at protecting the arresting officers, if justified by the circumstances, is nevertheless not a full search of the premises, but may extend only to a cursory inspection of those spaces where a person may be found."). "The sweep lasts no longer than is necessary to dispel the reasonable suspicion of danger and in any event no longer than it takes to complete the arrest and depart the premises." *Id.* at 335-36. When "a protective search goes beyond a search for weapons and becomes a search for evidence, it is no longer valid under *Terry*." *Baker*, 50 F.3d at 1194 ("The alleged actions in this case were full-scale searches for evidence, having nothing to do with a limited *Terry*-frisk, and having no probable cause justification. These allegations constitute Fourth Amendment violations."). Here, Defendants have provided no justification for their search of additional rooms and floors of the residence when Moreno was the first person to be identified and seized. (Docket No. 114-2 at 9).

The Court recognizes that Defendants rely on *Bryant v. City of Philadelphia*, 518 F. App'x 89, 92 (3d Cir. 2013), for their position that the use of a SWAT team does not automatically violate the occupant's rights against unreasonable seizure, despite allegations of being kicked while handcuffed. In *Bryant*, however, (1) the court ruled based on a post-trial motion with factual findings from trial testimony; (2) the plaintiff was released from his handcuffs as soon as officers realized that he was not the individual that the warrant targeted; and, (3) the search warrant was for evidence rather than an individual. *Id.* at 91-93. Here, (1) the issue comes before the Court on summary judgment; (2) Plaintiffs remained in handcuffs even after Moreno was identified and seized; and, (3) the search warrant was not for evidence, but for

Moreno as an individual. To that end, Ms. Moreno, Mr. Staymates, and the younger 20s male could not have been confused with Moreno, yet all were immediately handcuffed, which a reasonable jury may conclude were activities beyond the scope of the search warrant. (Docket No. 114-1 at 10). Under Third Circuit law, "[c]ontinuing to hold an individual in handcuffs once it has been determined that there was no lawful basis for the initial seizure is unlawful within the meaning of the Fourth Amendment." *Rogers v. Powell*, 120 F.3d 446, 456 (3d Cir. 1997).

Third, even if Defendants were attempting to conduct a protective sweep, that sweep does not justify conducting interrogations to identify other suspects from a bar fight that took place the previous evening at another location, which was the clear purpose of Reddy's questioning of Ms. Moreno. (Docket No. 114-5 at 14). Reddy admitted that he sought to identify the other suspects in the bar fight. *Id.* He asked Ms. Moreno if she knew who was involved in the fight, if Moreno had mentioned the fight, and if Moreno had talked to her about it. *Id.* A reasonable jury could conclude that interrogating Ms. Moreno while she and her family remained handcuffed, and in light of the SWAT raid of her home, was beyond the scope of the search warrant. *See Marasco II*, 430 F.3d at 148 (citing *Marasco I*, 318 F.3d at 515) ("In *Smith I*, we held that SERT's activities constituted a seizure, and that the only remaining question was whether the force used in doing so was reasonable."). To that end, the Supreme Court has held that "detention for custodial interrogation—regardless of its label—intrudes so severely on interests protected by the Fourth Amendment as necessarily to trigger the traditional safeguards against illegal arrest." *Dunaway v. New York*, 442 U.S. 200, 216 (1979) ("We accordingly hold that the Rochester police violated the Fourth and Fourteenth Amendments when, without probable cause, they seized petitioner and transported him to the police station for interrogation.").

Reddy also admitted that the reason that the City of Pittsburgh Police have "as many detectives as [they] have on scene for out [sic] operation" is "so one person isn't going around and interviewing every single person in the house." (Docket No. 114-5 at 9-10). According to Reddy, "[o]ther detectives can get other information, if they have pertinent information," and "then the detective can talk to them about that." *Id.* at 10. Detectives would obtain not only their "name, date of birth, [and] all their personal identifiers," but also "any information about this crime," and whether they were "involved in some way or even ha[d] knowledge of it," such as "do you know what happened last night or are you aware?" *Id.* at 9-10. Throughout the entire interrogation process, detectives would obtain all "this information from them while they are secure, while they are handcuffed." *Id.* at 10. Reddy provided no reason why he had to conduct his interview of Moreno while he was handcuffed and during the SWAT raid other than "once he is arrested, he goes pretty much straight to the jail." *Id.* at 8. A reasonable jury could conclude that the custodial interrogations of not only Ms. Moreno, but also Mr. Staymates and the younger 20s male, were beyond the scope of the search and arrest warrants for Moreno.

Fourth, Plaintiffs rely on their deposition testimony, photographs, and medical records for their claims of physical and emotional injury and gratuitous property damage. Defendants, however, did not secure an independent medical examination of Mr. Staymates, nor did they provide any independent appraisal of the allegedly damaged property. Instead, they argue that Mr. Staymates did not seek medical treatment for two months after the SWAT raid. As for T.M., they argue that their independent medical examination demonstrates that T.M.'s injuries were not caused by the SWAT raid. (Docket No. 102-21 at 1-3). They also maintain that T.M. did not seek medical treatment for three months after the SWAT raid, despite two intervening primary care physician visits. (Docket No. 102 at 12). Nonetheless, Defendants cannot prevail at the

summary judgment stage on Plaintiffs' claim of excessive force, even if Plaintiffs had sustained no physical injury. *See Sharrar*, 128 F.3d at 822 ("[T]he absence of physical injury [does not] necessarily signif[y] that the force has not been excessive."). Further, whether the delays in seeking treatment were reasonable is appropriately decided by the jury.

For the aforementioned reasons, Defendants are not entitled to summary judgment on the issue of whether their conduct in entering the Moreno residence constituted excessive force under the Fourth Amendment.

### C.    Qualified Immunity

Notwithstanding the foregoing analysis, Defendants argue the affirmative defense of qualified immunity, as a group, but do not assert this defense on a person-by-person basis. (Docket Nos. 102, 121). To evaluate qualified immunity, a two-step test in necessary. *Saucier v. Katz*, 533 U.S. 194, 201 (2001), *receded from by Pearson v. Callahan*, 555 U.S. 223, 236 (2009). First, an officer's conduct must violate a constitutional right. *Id.* Second, the constitutional right must have been clearly established at the time of the officer's conduct. *Id.* In *Pearson v. Callahan*, the Supreme Court clarified, "while the sequence set forth there is often appropriate, it should no longer be regarded as mandatory." *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

Under *Pearson*, "[a]n officer conducting a search is entitled to qualified immunity where clearly established law does not show that the search violated the Fourth Amendment." *Id.* at 243-44. "This inquiry turns on the objective legal reasonableness of the action, assessed in light of the legal rules that were clearly established at the time it was taken." *Id.* at 244-45 (internal quotation marks omitted). To determine whether the law was clearly established at the time of the conduct in question, Defendants must look to the case law of the Third Circuit. *Id.* "'Qualified immunity gives government officials breathing room to make reasonable but

mistaken judgments,' and 'protects all but the plainly incompetent or those who knowingly violate the law.'" *Stanton v. Sims*, 134 S. Ct. 3, 5 (2013) (quoting *Ashcroft v. al-Kidd*, 131 S. Ct. 2074, 2085 (2011)). Nevertheless, it is not necessary to have "'a case directly on point' before concluding that the law is clearly established, 'but existing precedent must have placed the statutory or constitutional question beyond debate.'" *Id.* (quoting *Ashcroft*, 131 S. Ct. at 2083).

To that end, the Third Circuit has made clear that "the second step in the *Saucier* analysis, i.e., whether an officer made a reasonable mistake about the legal constraints on police action and is entitled to qualified immunity, is a question of law that is exclusively for the court." *Curley*, 499 F.3d at 211 n.12. However, "[w]hen the ultimate question of the objective reasonableness of an officer's behavior involves tightly intertwined issues of fact and law, it may be permissible to utilize a jury in an advisory capacity, but responsibility for answering that ultimate question remains with the court." *Id.* at 211 n.12, 214-215 (internal citations omitted).

Here, Defendants have failed at this juncture to establish qualified immunity as a complete bar to Plaintiffs' claims. First, a reasonable jury could find that Defendants used excessive force in violation of the Fourth Amendment when they decided to use SWAT and through their conduct when they entered the residence to execute the warrant and seize Moreno.

Second, the law concerning appropriate use of SWAT was clearly established by the Third Circuit at the time of the conduct in question. In 2005, for instance, the Third Circuit held that a "decision to employ a SWAT-type team can constitute excessive force if it is not 'objectively reasonable' to do so in light of 'the totality of the circumstances.'" *Marasco II*, 430 F.3d at 149. The totality of the circumstances is to be determined by an officer under the *Sharrar* factors. *Id.* at 149-50 ("*Sharrar* was decided two years before the events at issue in this case. Therefore, it is appropriate for us to rely on that decision in our analysis of whether the

officers are entitled to qualified immunity, as the contours of the right at issue here—as set forth in *Sharrar*—were 'clearly established' at the time the troopers decided to activate SERT.").

The relevant *Sharrar* factors are as set forth as follows:

> [T]he severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight ... [whether] the physical force applied was of such an extent as to lead to injury ... the possibility that the persons subject to the police action are themselves violent or dangerous, the duration of the action, whether the action takes place in the context of effecting an arrest, the possibility that the suspect may be armed, and the number of persons with whom the police officers must contend at one time.

*Id.* at 150 (quoting *Sharrar*, 128 F.3d at 821-22). "[I]f an officer applies the *Sharrar* analysis in an unreasonable manner, he is not entitled to qualified immunity." *Id.* In *Marasco II*, the Third Circuit affirmed the trial court's holding that officers were entitled to qualified immunity in their decision to use SWAT-type force because they "believed that [plaintiff] was armed and that he had targeted a police officer with a laser-sighted weapon." *Id.* The Third Circuit has also held that "a reasonable officer would know, based on the *Graham* and *Sharrar* factors, that it would be excessive to grab and choke an arrestee's throat, especially before using lesser force; to hit him on the head twice with a flashlight; and to kick him when he is already restrained and on the ground." *Green v. New Jersey State Police*, 246 F. App'x 158, 163 (3d Cir. 2007).

Here, Defendants have presented no evidence concerning whether Moreno or any other individuals within the Moreno residence were likely to be armed. (Docket No. 114-1). As previously noted, no deposition testimony was provided on behalf of the officers who allegedly observed Moreno attempting to escape, which was the purported justification for their forced entry. None of the Defendants asked the U.S. Probation Officer whether Moreno could be armed or violent during the execution of an arrest warrant against him. To the extent that any

individual Defendants maintain that they did not participate in the decision to use SWAT, they have not provided the Court with any Statements of Fact or argument to that end. None of the Defendants seem to know who made the initial request for SWAT assistance. Even Morosetti denied making any such request. (Docket No. 114-3 at 5-6). Given the state of the record at this time, Defendants as a group are not entitled to qualified immunity on their decision to use SWAT. *See Marasco II*, 430 F.3d at 153 ("At this stage, however, we must assume that a jury would credit Fetterolf's version. If Marcantino did, in fact, approve the decision to enter the residence as well as the methods employed to do so, he is not entitled to qualified immunity.").

Moreover, even if an individual Defendant did not participate in the initial decision to use SWAT, each officer must still reassess the reasonableness of his own actions upon arriving at the Moreno residence. *See id.* at 151 ("Our conclusion that a reasonable officer would not have believed that the decision to activate SERT was unlawful does not necessarily entail that the same is true of all subsequent decisions regarding the use of SERT."). Because using SWAT "necessarily involves the decision to make an overwhelming show of force—force far greater than that normally applied in police encounters with citizens," it "does not grant license to law enforcement officers to abuse suspects or bystanders, or to vent in an unprofessional manner their own pent-up aggression, personal frustration or animosity toward others." *Marasco I*, 318 F.3d at 517-18. Instead, it "call[s] for more discipline, control, mindfulness, and restraint on the part of law enforcement, not less." *Id.* at 518 ("SWAT officers no less than others—dressed in camouflage or not—must keep it clearly in mind that we are not at war with our own people.").

Here, as in *Marasco II*, after viewing the facts in the light most favorable to the Plaintiffs, a reasonable officer would have concluded that the decision to storm the Moreno residence with flash-bang distraction devices violated Plaintiffs' constitutional rights. *See Marasco II*, 430 F.3d

at 152 ("Our review of the *Sharrar* factors leads us to conclude that, when the facts are viewed in the light most favorable to the plaintiffs, a reasonable officer would have concluded that the decision to storm Smith's shed and house using flash-bang distraction devices violated Smith's constitutional rights."). As previously noted, this case did not involve hostages, barricaded gunmen, snipers, or active shooters, in which time may have been of essence. *See id.* ("If the officers reasonably believed they were dealing with a hostage situation, then our analysis would be very different."). Any testimony by Defendants that they had concern for the safety of the other occupants of the Moreno residence is an issue of credibility appropriately determined by the jury. *See id.* ("[T]here is insufficient evidence in the record for us to conclude that the decision to enter Smith's house was made primarily out of a concern for Mrs. Smith's safety.").

Defendants are also not entitled to qualified immunity for any time in which they continued to maintain Plaintiffs in handcuffs after Moreno had already been identified and seized, and any protective sweep was complete. *See Rogers*, 120 F.3d at 456 ("Powell and Stine do not enjoy qualified immunity, however, beyond the time at which assistant district attorney Butts communicated to them that there was no reason to hold Rogers in custody.").

Therefore, Defendants as a group are not entitled to qualified immunity for their conduct in deciding to use SWAT, in entering the Moreno home after they had arrived at the scene, and in continuing to detain Plaintiffs after Moreno had been seized, as the submissions before the Court are plainly deficient to support qualified immunity for Defendants as a group, and Defendants have not raised qualified immunity on a person-by-person basis. To that end, individual Defendants may reassert this defense on a person-by-person basis at trial.

## IV. CONCLUSION

As there are genuine issues of material fact between the parties concerning whether the decision to use SWAT and Defendants' conduct while entering the Moreno residence constituted excessive force under the Fourth Amendment, Defendants' Motion for Summary Judgment [101] is denied. Furthermore, Defendants as a group are not entitled to qualified immunity at this time, as the Third Circuit has clearly established that the *Sharrar* factors govern a decision to use SWAT, *see Marasco II*, 430 F.3d at 149, and the use of SWAT involves a demonstration of overwhelming force that does not grant a license to officers to abuse suspects or bystanders. *See Marasco I*, 318 F.3d at 517-18. Accordingly, this case shall be set down for trial.

Based on the foregoing,

IT IS HEREBY ORDERED that Defendants' Motion for Summary Judgment [101] is DENIED.

IT IS FURTHER ORDERED that,

1. Plaintiffs shall file their Pretrial Statement by no later than **April 23, 2014 at 12:00 PM**.

2. Defendants shall file their Pretrial Statement by no later than **May 7, 2014 at 12:00 PM**.

3. A Status Conference is scheduled for **May 12, 2014 at 3:00 PM** to set a trial date and establish deadlines for the Court's Pretrial Order.

*s/ Nora Barry Fischer*
Nora Barry Fischer
United States District Judge

Date: April 9, 2014
cc/ecf: All counsel of record